**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Caremark LLC, et al., | No. CV-21-01554-PHX-SMB |
| Petitioners, | **ORDER** |
| v. | |
| Choctaw Nation, et al., | |
| Respondents. | |

Pending before the Court is Petitioners'[1] Petition for Order to Compel Arbitration (the "Petition"). (Doc. 1.)  The Petition is supported by Petitioners' Memorandum of Law. (Doc. 21.)  Respondents[2] filed a Response, (Doc. 28), and Petitioners replied, (Doc. 33). The parties did not request oral argument, and the Court declines to hold oral argument, finding that it is unnecessary.  *See* LRCiv 7.2(f).  The Court has considered the briefing and relevant law and will grant Caremark's Petition.

**I.     BACKGROUND**

---

[1] Petitioners include Caremark, LLC; Caremark PHC, LLC; CaremarkPCS Health, LLC; Caremark Rx, LLC; Aetna, Inc.; and Aetna Health, Inc.  Collectively, the Court will refer to Petitioners as "Caremark."

[2] Respondents include the Choctaw Nation; the Choctaw Nation Health Services Authority; the Choctaw Health Care, Talihina, OK; the Choctaw Nation Health Clinic-Rubin White, Poteau; the Choctaw Nation Health Clinic-McAlester; the Choctaw Nation Health Clinic-Idabel; the Choctaw Nation Health Clinic-Stigler; the Choctaw Nation Health Clinic-Hugo; the Choctaw Nation Health Clinic-Atoka; the Choctaw Nation Health Care Center Durant Pharmacy; and the Choctaw Nation Online Pharmacy Refill Center.  Collectively, the Court will refer to Respondents as the "Choctaw Nation" or the "Nation."

### A. Oklahoma Litigation

On April 26, 2021, the Choctaw Nation filed a complaint in the Eastern District of Oklahoma (the "Oklahoma Action") against eleven defendants, including all the named petitioners in this action. *See Choctaw Nation v. Caremark, LLC*, No. 6:21-CV-128-PRW (E.D. Okla. 2021). The Choctaw Nation's complaint in that case seeks redress under the Recovery Act, 25 U.S.C. § 1621e, which provides tribes with the statutory right to recoup costs of covered medical services provided to tribal members from applicable insurance coverage. (Doc. 16 at 3.) The complaint alleges that "[D]efendants violated its rights under the Recovery Act by improperly denying claims for reimbursement and by wrongfully applying insurance discounts that force tribal pharmacies to operate at a loss." (*Id.*)

### B. Petition for Order to Compel Arbitration

Caremark filed their Petition with this Court on September 10, 2021. (Doc. 1.) In the Petition, Caremark moved the Court to compel the Choctaw Nation and related parties to submit their dispute to an arbitrator under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (the "FAA"), and pursuant to alleged governing agreements. (Doc. 1 at 2.) The Petition alleges that Choctaw Nation pharmacies participate in multiple pharmacy networks operated by Caremark and entered into contracts with Caremark referred to as a "Provider Agreements." (*Id.* ¶ 2.) Caremark alleges that, pursuant to the Provider Agreements, the Choctaw Nation and related entities agreed that all disputes "in connection with, arising out of or relating in any way to" the Provider Agreements "[would] be exclusively settled by arbitration before an arbitrator in accordance with the rules of the American Arbitration Association." (*Id.* ¶ 3.) The petition alleges that the Choctaw Nation agreed to an arbitration location of Scottsdale, Arizona. (*Id.*)

### C. Chickasaw Nation Litigation

On December 29, 2020, the Chickasaw Nation filed a complaint in the U.S. District Court for the District of Oklahoma, which Caremark argues was "nearly identical to the Choctaw Nation's Complaint." (Doc. 22 at 7.) After the Chickasaw Nation filed its complaint, Caremark moved to stay the Oklahoma proceedings and filed a petition to

compel arbitration in the District of Arizona pursuant to § 4 of the FAA. (*Id*.) In an order dated July 2, 2021, a court in this district granted Caremark's Petition for an Order to Compel Arbitration, finding that—under the arbitration provision—the arbitrator, not the court, should decide the threshold issue of arbitrability. *Caremark, LLC v. Chickasaw Nation*, No. CV-21-00574-PHX-SPL, 2021 WL 2780859, at *3 (D. Ariz. July 2, 2021). The Chickasaw Nation appealed the decision, *see Caremark, LLC v. The Chickasaw Nation*, Case No. 21-16209, which is currently pending with the Ninth Circuit. The Ninth Circuit granted the Chickasaw Nation's request to expedite the appeal and placed it on the January 2022 calendar. (Doc. 16-2 at 2–3.)

### D. Order Denying Stay

On February 16, 2022, this Court issued an order denying the Choctaw Nation's motion to stay these proceedings until the Ninth Circuit had decided the Chickasaw Nation's appeal on a similar issue. (Doc. 34.)

## II. LEGAL STANDARD

In deciding whether to compel arbitration, a court determines two "gateway" issues: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). Where the dispute concerns who is empowered to decide arbitrability—court or arbitrator—there is a presumption in favor of judicial resolution rather than arbitral resolution. *Loc. Joint Exec. Bd. v. Mirage Casino-Hotel, Inc.*, 911 F.3d 588, 596 (9th Cir. 2018). However, the Supreme Court has consistently held that "parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by clear and unmistakable evidence." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S.Ct. 524, 530 (2019) (internal quotation marks omitted). Of course, a court must first determine whether a valid arbitration agreement exists. *Id.* "But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.* "Clear and unmistakable 'evidence' of agreement to arbitrate arbitrability might include …. an express agreement to do so." *Rent-A-Center,*

*W., Inc., v. Jackson*, 561 U.S. 63, 79–80 (2010) (Stevens, J., dissenting) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 946 (1995)).

### III.   DISCUSSION

Caremark argues that it has a contract with the Choctaw Nation that includes a valid, enforceable arbitration provision with a delegation clause that mandates that the issue of the arbitrability of the dispute be submitted to an arbitrator. (Doc. 21 at 17.) It further contends that the claims, facts, and agreement are nearly identical to those in the Chickasaw Nation litigation where the court granted Caremark's petition to compel arbitration. *See Chickasaw Nation*, 2021 WL 2780859, at *3. Caremark further argues that even if this Court were to decide arbitrability, the dispute in the Choctaw Nation's Oklahoma complaint is still subject to arbitration. (*Id.*) Lastly, Caremark insists that the Choctaw Nation cannot invoke sovereign immunity as a defense to Caremark's arbitration demands. (*Id.* at 18.)

The Choctaw Nation argues that the parties did not clearly and unequivocally agree to arbitrate the Nation's claims because none of the Nation's pharmacies ever signed a contract containing an arbitration clause with Caremark. (Doc. 28 at 12.) The Nation also contends that it did not clearly and unequivocally waive its sovereign immunity. (*Id.* at 12.) Furthermore, they argue that even if they had, the Recovery Act displaces such an arbitration agreement. (*Id.*)

### A. The Choctaw Nation Agreed to the Updated Provider Agreement/Manuel

The Choctaw Nation argues that the Provider Agreements which the pharmacies signed in 2005, 2008, and 2009 do not contain an arbitration provision, and that the arbitration provision was actually contained in the Provider Manuals. (Doc. 28 at 29–30.) Therefore, it concludes that the contracts cited by Caremark do not reflect a clear and unequivocal agreement to arbitrate the claims in the suit. (*Id.* at 29.) Furthermore, it argues that the pharmacies signed the Provider Agreements in 2005, 2008, and 2009, but that the arbitration clause requiring an arbitrator to decide arbitrability was not added to the

Provider Manuel until 2014. (*Id.* at 30–31.) The Nation's arguments are misguided.

As Caremark has shown, in 2009 all Respondent pharmacies entered into a new Provider Agreement with Caremark. (Doc. 33 at 16–17.) All Provider Agreements signed by Choctaw Nation pharmacies state, "This Agreement, the Provider Manual, and all other Caremark Documents constitute the entire agreement between Provider and Caremark, all of which are incorporated by this reference as if fully set forth herein and referred to collectively as the 'Provider Agreement' or 'Agreement.'" (Doc. 5-1 ¶ 27, Ex. H.) The 2004, 2007, 2009, 2011, 2014, 2016, and 2018 Provider Manuals each contained a provision which states, "From time to time, Caremark may amend the Provider Agreement, including the Provider Manual or other Caremark Documents, by giving notice to Provider of the terms of the amendment and specifying the date and amendment to become effective." (*Id.* ¶ 39.) Moreover, each Provider Manual states, "If Provider submits claims to Caremark after the effective date of any notice or amendment, the terms of the notice or amendment will be deemed accepted by Provider and will be considered part of the Caremark Provider Agreement." (*Id.*) Additionally, each Provider Manuel since 2004 has contained an arbitration provision. (Doc. 5-1 ¶¶ 28–36.) Thus, by the incorporation into the Provider Agreements of the Provider Manuals, the Provider Agreements have, in fact, contained an arbitration provision since 2004.

In 2014, Caremark sent the 2014 Provider Manual to the Choctaw Nation pharmacies. (*Id.* ¶ 32, Ex. N.) The Arbitration Provision covered any dispute "in connection with, arising out of, or relating in any way to" the Provider Agreement. (Doc. 9-13 at 48.) Further, the arbitration provision granted the arbitrator(s) "exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate."[3] (*Id.*) Each subsequent Provider Manual contained identical language. (Doc. 5-1, Exs. O, P, Q.) Further, Caremark provided a declaration and a supporting business record that Caremark sent the tribal pharmacies via

---

[3] Before this time, as far back as 2004, the arbitration provision in the Provider Manuals simply incorporated the AAA rules. (Doc. 9-8 at 50.)

UPS or FedEx. (*Id.* ¶¶ 29–38.) After receipt of the updated Provider Manuals, it is undisputed that all the Choctaw Nation pharmacies continued to submit claims for reimbursement to Caremark. (*Id.* ¶ 42.)

### 1. Incorporation by Reference of the Provider Manual

In Arizona, the basic rule of contract construction for incorporation by reference is that: "The reference must be clear and unequivocal and must be called to the attention of the other party, he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties…." *Weatherguard Roofing Co. v. D.R. Ward Const. Co.*, 152 P.3d 1227, 1229 (Ariz. Ct. App. 2007) (quoting *United California Bank v. Prudential Ins. Co. of America*, 681 P.2d 390, 420 (Ariz. Ct. App. 1983)) (cleaned up). Additionally, "[w]hile it is not necessary that a contract state specifically that another writing is 'incorporated by reference herein,' the context in which the reference is made must make clear that the writing is part of the contract." *Id.* (quoting *United California Bank*, 681 P.2d at 420).

Here, it is clear that the Provider Manuals were properly incorporated by reference into the Provider Agreements under Arizona law. The incorporation by reference of the Provider Manuals was clearly spelled out by the plain text of the Provider Agreements; the Provider Agreements explicitly stated that the Provider Manuals were incorporated by reference to the agreements. (*See, e.g.*, Doc. 5-1 ¶ 27, Ex. H.) Further, the Choctaw Nation is not arguing that they lacked access to the Provider Manuals or that they were unavailable to them. A representative of Caremark stated in a declaration that Caremark regularly sent the pharmacies updated provider manuals via FedEx or UPS. (*Id.* ¶ 30–32, 34–38.) Thus, the Court finds that the Provider Manuals were properly incorporated by reference into the Provider Agreements signed by the Nation's pharmacies.

### 2. Modification of Agreement with Updated Provider Manuals

The Court will next turn to the question of whether Caremark successfully modified the contract with updated terms through the updated Provider Manuals. Under Arizona law, to effectively modify a contract, there must be: "(1) an offer to modify the contract,

(2) assent to or acceptance of that offer, and (3) consideration." *Demasse v. ITT Corp.*, 984 P.2d 1138, 1144 (Ariz. 1999). Conduct, such as continuing to do business with a party despite receiving an offer to modify an agreement, "can be sufficient to manifest acceptance of an offer or acquiescence to the modification." *Cap. One Bank (USA), N.A. v. Davey*, No. 1 CA-CV-13-0109, 2013 WL 6729261, at *5 (Ariz. Ct. App. Dec. 19, 2013); *see Ancell v. Union Station Assocs., Inc.*, 803 P.2d 450, 453 (Ariz. Ct. App. 1990) ("Conduct can manifest acceptance of an offer or acquiescence in a modification."). Other courts analyzing the instant Caremark Provider Agreement under Arizona law have determined that pharmacies which continue to submit claims to Caremark after receiving an updated Provider Manual are bound by the updated terms. *See, e.g.*, *W. Va. CVS Pharm. LLC v. McDowell Pharm., Inc.*, 238 W. Va. 465, 475–477 (2017) (finding modification of the agreement, under Arizona law, when pharmacies received updated Provider Manuals and continued to submit claims to Caremark); *Grasso Enterprises, LLC v. CVS Health Corp.*, 143 F. Supp. 3d 530, 538 (W.D. Tex. 2015) ("[I]f a pharmacy does not agree to the new terms, it may simply reject the amendment by ceasing to submit claims to CVS/Caremark.").

Here, the conduct of the Nation's pharmacies manifested assent to the updated terms in the Provider Manuals. The Provider Manuals contained a provision stating that Caremark could update the terms by giving the providers the terms of the amendment and the date that the amendment would become effective. (Doc. 5-1 ¶ 39.) The Provider Manuals were clear that if providers continued to submit claims to Caremark after the date that the updated terms became effective, that would evidence the providers' acceptance of the updated terms. It is undisputed that all providers continued to submit claims to Caremark after receiving each updated version of the Provider Manual. (*Id.* ¶ 42.) Caremark would send the Nation's pharmacies the updated Provider Manual via FedEx or UPS. (*Id.* ¶¶ 29–38.) Caremark maintained a business record to track proof or receipt of the deliveries to the Choctaw Nation pharmacy headquarters from 2016 to 2020. (Doc. 9-17, Ex. R.) Each time Caremark sent the pharmacies a new Provider Manual with updated

terms, Caremark was offering to modify the terms of the agreement, and the Nation's pharmacies' conduct of continuing to submit claims to Caremark after the effective date of the new terms evidence assent to be bound by the new terms. *See Davey*, 2013 WL 6729261, at *5. The Nation argues that the parties did not initial the changes to the agreement as required in the Provider Agreements. (Doc. 28 at 20.) Nonetheless, the Court finds that the conduct of the pharmacies—continuing to submit claims after receiving the updated Provider Manuals—provides evidence of assent to the new terms independent of whether the pharmacies initialed their intent to modify the agreement. If they did not agree to the modification, the pharmacies simply could have stopped submitting claims or contacted Caremark to negotiate new terms. Thus, the parties effectively modified the terms of the agreements through this process. Consequently, the Nation's pharmacies are bound by the updated terms.

### B. Delegation Clause

The Court finds that the delegation clause is clear and unmistakable; an arbitrator—not this Court—should decide the threshold question of arbitrability. Since 2014, the arbitration provision of the Provider Manual states: "The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including but not limited to any claim that all or part of the agreement to arbitrate is void or voidable for any reason." (Doc. 9-13 at 47.) This language is clear and unmistakable and shows that the parties intended for an arbitrator to decide arbitrability. *See Chickisaw Nation*, 2021 WL 2780859, at *3 ("The parties clearly agreed that the arbitrator(s), not the court, would decide the threshold issue of arbitrability."). Thus, the Court must step aside and allow the arbitrator to decide whether the claims in this case are subject to arbitration.

Caremark also points out, correctly, that the Provider Manuals stated—as far back as 2004—that "[a]ny and all controversies in connection with or arising out of the Provider Agreement, which cannot be settled by the parties, will be exclusively settled by arbitration before a single arbitrator in accordance with the Rules of the American Arbitration

Association." (Doc. 9-8 at 50.) In the Ninth Circuit, "incorporation of the AAA rules constitutes clear and unmistakable evidence that the contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1125. Therefore, even if the agreement was not properly modified to add the delegation clause, the parties agreed to arbitrate arbitrability by the incorporation of the AAA rules as early as 2004. Accordingly, the Court must allow the arbitrator to decide the threshold issue of arbitrability.

### C. Sovereign Immunity

The Choctaw Nation also argues that the tribal sovereign immunity requires a clear and unequivocal agreement to arbitrate and that none exists here. (Doc. 28 at 23.) Caremark argues that the Court need not address the Nation's sovereign immunity argument because Caremark is not asserting any claims against the Nation. (Doc. 33 at 4.) Caremark also argues that even if this were not so, the arbitration provision constitutes a clear and unequivocal waiver of sovereign immunity. (Doc. 33 at 15.)

"Tribal sovereign immunity protects Indian tribes from suit absent express authorization by Congress or clear waiver by the tribe." *Pistor v. Garcia*, 791 F.3d 1104, 1110 (9th Cir. 2015) (quoting *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 725 (9th Cir. 2008)); *see also C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe*, 532 U.S. 411, 418 (2001) (holding that the tribe agreed, by express contract, to resolve disputes by arbitration and noting that the tribe itself tendered the contract calling for those procedures).

Here, the Choctaw Nation pharmacies clearly and unequivocally waived sovereign immunity when they signed contracts with an express arbitration provision. As explained above, the Nation's pharmacies clearly agreed to the Provider Agreements by signing the agreements as early as 2004. *Supra* § III(a). The Provider Agreements incorporated by reference the Provider Manual, which contained an arbitration clause. As early as 2004, the Provider Manual incorporated the AAA rules, meaning that the parties had agreed that an arbitrator would arbitrate arbitrability. *See Brennan*, 796 F.3d at 1125. The parties modified the agreements when Caremark sent updated Provider Manuals, and the

pharmacies continued to submit claims to Caremark after the effective dates. Under these facts, the Choctaw Nation pharmacies expressly agreed to the Provider Agreement and clearly agreed to arbitrate disputes under the agreement. Thus, the Nation has waived its sovereign immunity for claims brought related to the Provider Agreement.

### D. The Recovery Act

Lastly, the Nation argues that the Recovery Act displaces the arbitration provision. (Doc. 28 at 40.) Caremark argues that because there is a valid delegation clause, whether the Recovery Act displaces any agreement to arbitrate must be decided by the arbitrator in the first instance. (Doc. 33 at 25.)

The Recovery Act allows tribes to recover from insurance companies the reasonable charges billed by a tribe in providing health services. *See* 25 U.S.C. § 1621e(a). The Act states, "[N]o provision of any contract shall prevent or hinder the right of recovery of the United States, an Indian tribe, or tribal organization under subsection (a)." 25 U.S.C. § 1621e(c). The statute is silent regarding arbitration. *See id.*

Because the Court has found that the parties agreed to a valid delegation clause, whether the Recovery Act displaces the arbitration provision is a question for the arbitrator. The Supreme Court and Ninth Circuit are clear that "[w]here a delegation provision exists, court first must focus on the enforceability of that specific provision, not the enforceability of the arbitration agreement as a whole." *Brice v. Haynes Invs., LLC*, 13 F.4th 823, 827 (9th Cir. 2021) (citing *Rent-A-Center*, 561 U.S. at 71; *Brennan*, 796 F.3d at 1132 (9th Cir. 2015)). As stated by the court in *Brice*, whether an arbitration agreement is unenforceable in light of a federal cause of action "is for the arbitrator to decide so long as the delegation provision itself does not eliminate parties' rights to pursue their federal remedies." *Id.* at 837. So it is here. The delegation clause at issue does not limit the parties' rights to pursue federal causes of action. Thus, whether the Recovery Act displaces an agreement to arbitrate is an arbitrability question that the Court "may not decide." *Id.* (quoting *Henry Schein, Inc.*, 139 S. Ct. at 529–30.). Therefore, the Court will leave this question for the arbitrator.

## IV. CONCLUSION

For the reasons discussed above, the Court will grant Caremark's Motion and compel arbitration between the parties under § 4 of the FAA. Accordingly,

**IT IS ORDERED** granting Petitioners' Petition to Compel Arbitration. (Doc. 1.)

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in favor of Petitioners and terminate this action accordingly.

Dated this 14th day of March, 2022.

_____
Honorable Susan M. Brnovich
United States District Judge